J-A07003-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
TAJ AMARI TUCKER :
:
Appellant : No. 420 MDA 2025

Appeal from the Judgment of Sentence Entered December 3, 2024
In the Court of Common Pleas of Cumberland County Criminal Division at
No(s): CP-21-CR-0001168-2023

BEFORE: BOWES, J., DUBOW, J., and NEUMAN, J.

MEMORANDUM BY BOWES, J.: **FILED: JUNE 18, 2026**

Taj Amari Tucker appeals from the aggregate judgment of sentence of three to six years of imprisonment imposed following his convictions for various sexual assault offenses. We affirm.

The trial court provided the following factual background:

The victim[, who was nineteen years old,] went to a house party in March of 2021 at the invitation of one of her co-workers, R.J. [Appellant]'s co-defendant, [Chase] Toombs, another co-worker of the victim, was also at the party, though the victim said she "didn't really like him." She said she drank a lot of wine while on medication and began "coming in and out of blacking out," meaning she started "losing periods of time." She recalled playing beer pong with Mr. Toombs and interacting with both [Appellant and Mr. Toombs] in group conversation over the course of the night, though she had never met [Appellant] before the party. She remembered sitting on the couch in the basement "and then missing periods of time and then suddenly she was playing a board game." She recalled blacking out while playing the board game and regaining consciousness in the bathroom, where she found herself alone with [Appellant and Mr. Toombs]. She had no

recollection of how she got into the bathroom with the[m], but when she "came to," she was performing oral sex on Mr. Toombs.

She described the scene in the bathroom with [Appellant and Mr. Toombs] as follows:

> I remember being in between them. And one was in front of me and one was behind me. And I remember it was Mr. Toombs in front of me and [Appellant] behind me. And [Appellant] was saying that it wouldn't fit. And I remember that Mr. Toombs was having my mouth on him and then they would swap places. And Mr. Toombs said that he couldn't fit it in either. And so they tried the other hole. And that - and then I remember blacking out again. And then I would come back again. And I remember it was - and I remember there was blood on me. I remember Mr. Toombs leaving. And I remember getting my mouth - my mouth to the point it was bleeding and I just kept getting told that it was fine and I was fine. And I remember saying I'm too drunk for this. My legs were straight and I was bent forward. And they were both standing straight up in front and behind me.

Both [Appellant and Mr. Toombs] had their pants and underwear off at the time. When [Appellant] was behind the victim, while the victim performed oral sex on Mr. Toombs, [Appellant] attempted both vaginal and anal penetration, and "it was just pain the whole time. It felt really awful. It was really bad." The victim said she was thinking mostly of the pain, felt like she couldn't speak, and was just "trying not to fall over." She felt "sick and gross." [Appellant and Mr. Toombs] turned her body around to face the opposite direction, which she believed was because she couldn't have moved on her own, and the victim performed oral sex on [Appellant] as Mr. Toombs attempted penetration, just as [Appellant] had done. At some point, Mr. Toombs left the bathroom, at which time the victim recalled her "lip getting bit and that it was bleeding," and [Appellant] telling her, "it's fine, you're fine, it's fine." Mr. Toombs returned to the bathroom to wash blood off of his hands and left again. The victim told [Appellant], "I'm too drunk for this," though [Appellant] "kept trying" to have the victim perform oral sex on him after Mr. Toombs left. She remembered feeling sick and trying not to vomit. She said she

did not consent to sexual acts with [Appellant or Mr. Toombs] and never would have.

The victim could not recall how the encounter ended, but she remembered having to be helped to [R.J.'s] car to go home. On cross-examination of the victim, Mr. Toombs'[s] counsel read aloud and secured the admission of messages the victim sent to one of her sisters before she got home, in which she told her sister that she "might've had a threesome with Mr. Toombs and some guy." She did not recall sending the messages. The victim said that her sister was screaming at her when she got home, until her other sister noticed the blood on her clothing and both sisters told her she needed to go to the hospital.

R.J., who invited the victim to the party, testified that [Appellant] and Mr. Toombs "were talking about something and then they just went into the bathroom" together. A minute or so later, the victim said she "just wanted to see what's going to happen" and followed the[m] to the bathroom, where they remained for about [twenty] minutes. He did not notice any indication from the victim that she was injured. The victim's sister texted R.J. asking him to take the victim home, so he did, and the victim said nothing the entire ride though she was leaning over. R.J. thought she was going to vomit in the car. The victim's sister, Jasmine Schreffler, who worked [as a manager] at Five Guys with Mr. Toombs and the victim, [exchanged] Snapchat messages . . . with Mr. Toombs the night of the assault, which included the following[:[1]]

<u>Ms. Schreffler:</u>

> Just so you know my fuxking sister is bawling on the floor crying be of what you did [hand clapping emoji] hope.youre proud

<u>Mr. Toombs:</u>

> No like I'm quitting

> I'm not ok with what jappen

> I even told her I dint want to

---

[1] We have reproduced the texts verbatim.

Ms. Schreffler:

  Bc you know it was fucking wrong pathetic and disgusting. [middle finger emoji]

Mr. Toombs:

  Yea

Ms. Schreffler:

  Don't fucking try to get sympathy. You did it chase.

Mr. Toombs:

  Not

  I'm not

Ms. Schreffler:

  Don't say you told her you didn't want to when ya still fucking did it.

Mr. Toombs:

  I'm a shifty person

  Shitty

Ms. Schreffler:

  Yes indeed you fucking are

Mr. Toombs:

  I did

Ms. Schreffler:

  Fucking disrespectful an pathetic.

Mr. Toombs:

     Yea

Jamie Wilson, the victim's friend's stepmother, . . . her stepson, and her husband picked the victim up later that night to take her to have a sexual assault examination completed. Ms. Wilson said the victim looked like she was crying, "her hair didn't look good, her eyeliner was everywhere, and she seemed pretty upset." The nurse who performed the sexual assault examination . . . observed dried blood on the victim's external genitalia, a tear and bruising near the vaginal opening, a tear and tenderness in the area between the vaginal opening and the rectum, bite injuries to the victim's lips, and scratches on the victim's thighs. The nurse said the victim was not able to tolerate a pelvic exam due to pain. The Commonwealth's serology expert identified spermatozoa on the victim's perianal and rectal DNA swab and in the fabric of the victim's underwear, in addition to blood in the underwear. The Commonwealth['s] forensic DNA expert [found] that [Appellant]'s DNA matched DNA extracted from the perianal and rectal swabs and the underwear fabric, but Mr. Toombs was excluded as a match.

[Appellant and Mr. Toombs conversed through text message] two nights after the assault, which included the following exchange:

Mr. Toombs:

     What happen

     When I left the bathroom

[Appellant]:

     Bro I was pulling my pants up Nd she was to Nd she like pushed me back and staring kissing me

     Nd then she stroked my dick

     Nd then we continued

Mr. Toombs:

     Then why u think we fucked up

[Appellant]:

Wym[2]

Mr. Toombs:

Do u think we fucked up

[Appellant]:

I think we fucked up cause I didnt wanna fuck nobody cause of who I got my eyes for

Mr. Toombs:

Qhats ur story

I wanna make sure we both line up

[Appellant]:

Exactly what happen how it happen

Mr. Toombs:

U tell me

So we both on the same page

??

[Appellant]:

Ima come up with sumn to not fuck sis over

Ima tell em straight what happen we was all chilling I told my bro (you) to come in the bathroom cause I had to talk to him bout sumn Nd it was private she just opened the door Nd came in the bathroom wit us as we were talking

---

2 "Wym" is a common abbreviation for "what do you mean."

She asked us what we were doing Nd I said talking wat happened Nd she came on to us Nd was tryna gut us horny [unknown emojis] Nd proceeded u left the bathroom Nd wen u left I was getting dressed she did sum to me

Nd then I'm telling what happen wen u left the bathroom

I'm keeping it a [unknown emoji] if they ask me

She came in the bathroom without invite

Mr. Toombs:

Facts

[Appellant]:

[unknown emojis]

Mr. Toombs:

Make sure to clarify u and I were joking ar with each other and she joined in

Too

[Appellant]:

[unknown emojis]

We ain't do nun she came onto us

Mr. Toombs:

Yea

[Appellant]:

We cool

Mr. Toombs:

> Yea
>
> I'm jus still not ok that that happened
>
> [Appellant]:
>
> Me either
>
> I let the Henny[3] control me
>
> Bett that

Trial Court Opinion, 5/30/25, at 2-8 (cleaned up).

Based on the aforementioned events, Appellant was arrested and charged with one count each of rape, involuntary deviate sexual intercourse ("IDSI"), aggravated indecent assault, sexual assault, indecent assault, simple assault, harassment, and a corresponding conspiracy charge for each offense. Appellant filed a pre-trial motion to admit the results of the sexual assault evidence collection kit, which revealed DNA evidence of a third unknown male's spermatozoa on the victim's underwear, to "contradict the alleged victim's statements regarding other prior consensual activity prior to or after the alleged assault." **See** Motion to Admit Past Sexual Conduct, 5/7/24, at ¶ 17. After a hearing, the court denied the motion. The matter proceeded to a joint jury trial with Mr. Toombs, where various witnesses,

---

[3] Mr. Toombs testified that Appellant was drinking Hennesy brandy on the night in question.

including the victim, the sexual assault examination nurse, the victim's sister, the investigating officers, and R.J., established the above facts.

Appellant did not testify, but Mr. Toombs attested that he and Appellant had gone into the bathroom together when the victim entered uninvited, pulled Mr. Toombs's pants down, and placed her mouth on his penis. He explained that she turned herself around to place her mouth on Appellant's penis, and Mr. Toombs tried to have vaginal sex with the victim, but he could not perform. He stated that neither he nor Appellant was shocked that the victim had walked into the bathroom while he and Appellant were chatting and spontaneously began to have sex with the both of them. Mr. Toombs exited the bathroom when he noticed that the victim had blood on her thigh. He was unaware of what occurred between Appellant and the victim after he left, but they both walked out together some time after and neither seemed to be upset. Mr. Toombs was uncomfortable that the victim was his coworker and the sister of his manager, Ms. Schreffler, but did not question why Ms. Schreffler told him that the victim was upset after the encounter, despite his claim that the sex was consensual.

At the conclusion of testimony, the jury found Appellant guilty of sexual assault, indecent assault by forcible compulsion, simple assault, and the corresponding conspiracy charges as to each of those offenses, but it acquitted

him as to rape, conspiracy to commit rape, IDSI, and conspiracy for IDSI.[4] The court subsequently issued the above-referenced sentence.

Appellant's timely appeal followed, and he and the court complied with the dictates of Pa.R.A.P. 1925. He raises five questions for this Court's consideration:

> I.    Whether the evidence presented at trial was insufficient to find Appellant guilty [of] criminal conspiracy to sexual assault, criminal conspiracy to indecent assault, and criminal conspiracy to simple assault, where there was no evidence to prove the existence of an agreement between Appellant and [Mr.] Toombs to commit the underlying offenses?
>
> II.   Whether the evidence presented at trial was insufficient to find Appellant guilty [of] indecent assault by forcible compulsion, where there was no evidence admitted at trial to prove forcible compulsion?
>
> III.  Whether the evidence presented at trial was insufficient to find Appellant guilty [of] sexual assault without consent, where the evidence admitted at trial was insufficient to prove lack of consent?
>
> IV.   Whether the trial court abused its discretion in denying Appellant a new trial as the verdicts were against the weight of the evidence such as to shock one's sense of justice?
>
> V.    Whether prohibiting Appellant from using DNA evidence of a third unknown male for impeachment purposes deprived Appellant of his rights to due process and a fair trial under both the Constitution of the United States and the Constitution of Pennsylvania?

Appellant's brief at 6-7 (cleaned up, numerals of counts of offenses omitted).

_____

[4] Mr. Toombs was convicted and acquitted of the identical offenses.

- 10 -

We address Appellant's first three issues collectively, as they assail the sufficiency of the evidence, for which the following law applies:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt.  In applying the above test, we may not weigh the evidence and substitute our judgment for the fact-finder.  In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence.  Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances.  The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence.  Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered.  Finally, the finder of fact[,] while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part[,] or none of the evidence.

*Commonwealth v. Travinski*, 346 A.3d 787, 791 (Pa.Super. 2025) (cleaned up).

Appellant challenges the sufficiency of the evidence for the subsequent offenses.  First, as to conspiracy:

> A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:
>
>> (1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or
>>
>> (2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime.

- 11 -

18 Pa.C.S. § 903(a). We have explained that "an explicit or formal agreement to commit crimes can seldom, if ever, be proved and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Murphy*, 795 A.2d 1025, 1038 (Pa.Super. 2002) (cleaned up). Accordingly, "a conspiracy may be inferred where it is demonstrated that the relation, conduct, or circumstances of the parties, and the overt acts of the co-conspirators sufficiently prove the formation of a criminal confederation." *Id*. (cleaned up).

Indecent assault by forcible compulsion occurs where a "person has indecent contact with the complainant, causes the complainant to have indecent contact with the person[,] or intentionally causes the complainant to come into contact with seminal fluid, urine[,] or feces for the purpose of arousing sexual desire in the person or the complainant and . . . the person does so by forcible compulsion[.]" 18 Pa.C.S. § 3126(a)(2). "Forcible compulsion" is defined, in pertinent part, as "[c]ompulsion by use of physical, intellectual, moral, emotional[,] or psychological force, either express or implied." 18 Pa.C.S. § 3101. Whether forcible compulsion has been employed is assessed based on the totality of the circumstances, including the:

> Respective ages of the victim and the accused, the respective mental and physical conditions of the victim and the accused, the atmosphere and physical setting in which the incident was alleged to have taken place, the extent to which the accused may have been in a position of authority, domination or custodial control over the victim, and whether the victim was under duress.

***Commonwealth v. Gonzalez***, 109 A.3d 711, 721 (Pa.Super. 2015) (cleaned up). It need not be proven that "the victim resisted the assault in order to prove forcible compulsion." ***Id***. (citation omitted).

Finally, a person commits sexual assault "when that person engages in sexual intercourse or deviate sexual intercourse with a complainant without the complainant's consent." 18 Pa.C.S. § 3124.1. This Court has held that "forcible compulsion subsumes a lack of consent." ***Commonwealth v. Banniger***, 303 A.3d 1085, 1093 (Pa.Super. 2023) (citation omitted). Thus, where the Commonwealth has proved "that a defendant exercised forcible compulsion, then it has proved that the victim did not consent." ***Id***.

Appellant contends that the Commonwealth failed to prove "the existence of an agreement" between him and Mr. Toombs to commit sexual assault, indecent assault, and simple assault against the victim, and therefore the evidence was insufficient to sustain the corresponding convictions for conspiracy. ***See*** Appellant's brief at 46. He avers that because he and Mr. Toombs did not invite the victim to the party and the sexual encounter was unplanned, there was no collusion between the two to harm the victim. ***Id***. at 48-49. As to indecent assault, Appellant argues that there was no evidence of forcible compulsion where the victim failed to claim that Appellant and Mr. Toombs's act of turning her around was "forceful or violent." ***Id***. at 55. He maintains that neither he nor Mr. Toombs "had threatened her or restrained her." ***Id***. at 56. Appellant lastly declares that the evidence was insufficient

to convict him of sexual assault, particularly as to a lack of consent, where the victim "never said no, never said stop, and never told Appellant or [Mr.] Toombs that she did not want to do this." *Id*. at 59 (cleaned up).

The trial court provided the following relevant analysis as to each of Appellant's challenged convictions:

The Commonwealth presented sufficient evidence to establish that [Appellant] agreed to aid in the commission of these offenses and sufficient evidence to establish an agreement between [Appellant and Mr. Toombs] that one or both would commit the offenses. It was undisputed at trial that [Appellant and Mr. Toombs] entered the bathroom together, without the victim present. When the victim "came to," she found herself in the bathroom physically between [Appellant and Mr. Toombs], both of whom had their pants and underwear off. She was bent over with Mr. Toombs'[s] penis inside her mouth and [Appellant] was attempting vaginal and anal intercourse with the victim as she tried not to fall over, at which time [Appellant] "was saying that it wouldn't fit" before [he and Mr. Toombs] acted in concert to physically turn the victim around to switch roles in pursuit of Mr. Toombs attempting to penetrate the victim just as [Appellant] had done. Mr. Toombs made the same announcement relative to penetration when he attempted intercourse. . . .

[Appellant and Mr. Toombs's] joint entry into the bathroom, their verbal narration to each other about whether they were successful at penetrating the victim, and their coordination of physically turning the victim around between them, in addition to their joint attempt to cover up the event after the fact all establish enough circumstantial evidence of their shared criminal intent and agreement to work with each other, in aid of each other, for the purpose of completing the target offenses together, by acting on an agreement that each would have the victim perform oral sex, that each would penetrate the victim while the other was performing oral sex, and that same would proceed notwithstanding causing her pain and injury which became its own conspiracy upon plain evidence that the pair was injuring the victim for the duration of their pursuits.

. . . .

- 14 -

The evidence was sufficient for the jury to find that [Appellant] had indecent contact with the victim for the purpose of arousing his own sexual desire by forcible compulsion. The victim's testimony established that she was alone in the bathroom between [Appellant and Mr. Toombs] who had her bent over performing sexual acts with them on either side of her, including [Appellant] attempting anal and vaginal penetration which caused her substantial pain at a time when she felt like she couldn't speak. The victim had been drinking and was in such a physical state that she could not physically move herself between [Appellant and Mr. Toombs] to the extent that the[y] had to move her so that their sexual offenses could continue. The victim was trying only to remain upright and not vomit. [Appellant and Mr. Toombs], meanwhile, were capable enough to maneuver her body around in the bathroom and repeatedly attempt vaginal and anal intercourse. The victim was bleeding from the mouth and in significant pain from the forced attempts to penetrate her vaginally and anally, [Appellant] ignored her obvious signs of injury by repeating to her, "it's fine, you're fine, it's fine," and [Appellant] continued attempting to have the victim perform oral sex on him after she told him she was too drunk to do it, some time in the midst of Mr. Toombs exiting and re-entering the bathroom to wash blood off of his hands. The victim had bruising, tenderness, and a tear near her vagina and perianal area and scratches to her thighs. She did not consent to this conduct. The evidence was sufficient for forcible compulsion. ***See Commonwealth v. Jones***, 226 A.3d 664, 2020 WL 522221, at *3 (Pa.Super. 2020) (non-precedential decision) (finding sufficient evidence for forcible compulsion where the victim could not verbally or physically resist due to intoxication while the defendant had little to drink and the defendant "used this position of dominance, as well as physical force" by, *inter alia*, pushing her underwear aside and roughly penetrating her vagina).

. . . .

Because "forcible compulsion subsumes a lack of consent," meaning that "if the Commonwealth proves that a defendant exercised forcible compulsion, then it has proved that the victim did not consent," our analysis of the forcible compulsion element (used over the course of [Appellant]'s conduct) in the previous section suffices to address the consent element for sexual assault. ***See Banniger***, 303 A.3d at 1093.

- 15 -

Trial Court Opinion, 5/30/25, at 10-15 (cleaned up, citations altered).

We agree with the trial court's apposite analysis. The record confirms that the Commonwealth presented sufficient facts to enable the jury to find that each of the challenged elements of the various convictions in this matter was established by a preponderance of the evidence. Appellant's first three issues are therefore meritless.

Appellant next asserts that the verdicts were against the weight of the evidence. We observe the following:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Person*, 325 A.3d 823, 836 (Pa.Super. 2024) (cleaned up). This Court has explained that in jury trials, the jury is the "ultimate fact-finder and the sole arbiter of the credibility of each of the witnesses." *Commonwealth v. Jacoby*, 170 A.3d 1065, 1080 (Pa. 2017). Thus, "a jury is entitled to resolve any inconsistencies in the Commonwealth's evidence in the manner that it sees fit." *Id*. (cleaned up).

Appellant argues that the court's denial of a new trial was a "result of partiality." Appellant's brief at 69. Specifically, he accuses the court of

- 16 -

ignoring testimony "that undermined [the victim]'s claims of being heavily intoxicated and created a strawman in order to dismiss evidence supporting Appellant's and [Mr. ]Toombs's claims that any contact was consensual." *Id*. at 67. Appellant laments that the court indicated that the victim's ability to recall the exact sequence of events of the night in question should be analyzed within the context of her being intoxicated. *Id*. at 64. In his view, however, the testimony failed to bear out that the victim was "obviously intoxicated." *Id*. at 66. He postulates that "the trial court's denial of Appellant's claim was not a dispassionate conclusion within the framework of the law but instead gave effect to the will of the judge[.]" *Id*. at 69.

The court supported its decision to deny Appellant a new trial thusly:

[Appellant and Mr. Toombs's] joint theory at trial was that the sexual acts occurred with the victim's consent, which was put at issue most directly by Mr. Toombs'[s] testimony that it was the victim who entered the bathroom and initiated oral sex with him. He also testified, for example, that the reason he expressed remorse to the victim's sister about the incident after the fact was not because he believed he did something criminal but because "doing that with a co-worker let alone my manager's sister" was "not okay" with him. The jury was free to be as incredulous of this testimony as was this court. As the Commonwealth pointed out on cross-examination of Mr. Toombs, he did not appear surprised that the victim was at home crying on the floor when she got home and did not question the victim's sister as to why, if he believed the encounter was consensual.

We also note that in cases of sexual offenses where the victim's mental state is altered by alcohol or otherwise, courts must view the victim's testimony in the context within which the testimony relates, meaning that for cases of intoxicated or unconscious victims, it would be unsurprising to the jury that the victim will not recall every detail, and more weight should not be afforded to a defendant's testimony merely because he was able to "recall"

- 17 -

more of the event than she.  Similarly, we were not troubled by the fact that the victim initially told her sister that she had a "threesome" rather than that she was assaulted until she arrived home, or that he sister was yelling at her about same, as the victim did not recall sending such a text message, nor must a victim of a sexual assault immediately label and announce that she was assaulted within minutes of the event.

The jury heard the victim's testimony, and that of those who saw and spoke with her on the evening at issue, and evidently found her testimony credible as it related to the guilty verdicts returned. The jury was free to disbelieve whatever remained.  It was also the jury's prerogative to resolve not only inconsistencies between defense and Commonwealth evidence, but within the Commonwealth's evidence alone, however it deemed fit.  We have summarized the Commonwealth's evidence at length herein, and will not do so again, but we do note that the victim credibly testified that she did not consent to sexual contact, that [Appellant and Mr. Toombs] physically turned her body around to swap positions in pursuit of sexual contact because she could not move her own body, that she was trying only not to vomit, that she was bleeding and was repeatedly quelled by [Appellant] telling her "it's fine, you're fine," and that she told [Appellant] she was "too drunk for this" but he continued assaulting her.  The verdicts did not shock this court's sense of justice, nor were we of the mind that right had not prevailed.

Trial Court Opinion, 5/30/25, at 16-17 (cleaned up).

The court's rationale does not demonstrate an abuse of discretion.  It properly considered that the victim may have had an unclear memory where she attested to imbibing a significant amount of alcohol while on medication, causing her to come in and out of consciousness throughout the evening.  *See* N.T. Jury Trial, 8/22/24, at 32-42.  As noted by the court, the jury was free to ignore the evidence it deemed incredible, including Mr. Toombs's version of events.  *See Jacoby*, 170 A.3d at 1080.  The denial of Appellant's motion for

- 18 -

a new trial therefore was not manifestly unreasonable or the product of bias or ill-will.

Appellant finally asserts that the court abused its discretion in refusing to permit him to introduce DNA evidence of a third unknown male found on the victim's underwear. "A trial court's ruling on the admissibility of evidence of the sexual history of a sexual abuse complainant will be reversed only where there has been a clear abuse of discretion." *Commonwealth v. Jerdon*, 229 A.3d 278, 284 (Pa.Super. 2019). The Rape Shield Law governs this matter, which "is designed to protect alleged victims of sexual assault in criminal trials and, subject to limited exceptions, it excludes evidence of an alleged victim's past sexual history." *Commonwealth v. Thomas*, 336 A.3d 1038, 1044 (Pa.Super. 2025) (cleaned up).

The Rape Shield Law provides, in relevant part, as follows:

**(a) General rule.--**Evidence of specific instances of the alleged victim's past sexual conduct, past sexual victimization, allegations of past sexual victimization, opinion evidence of the alleged victim's past sexual conduct, and reputation evidence of the alleged victim's past sexual conduct shall not be admissible in prosecutions of any offense listed in subsection (c) except evidence of the alleged victim's past sexual conduct with the defendant where consent of the alleged victim is at issue and such evidence is otherwise admissible pursuant to the rules of evidence.

18 Pa.C.S. § 3104.

As to the admissibility of Rape Shield Law evidence:

Trial courts hold an *in camera* hearing and conduct a balancing test consisting of the following factors: (1) whether the proposed evidence is relevant to show bias or motive or to attack credibility;

(2) whether the probative value of the evidence outweighs its prejudicial effect; and (3) whether there are alternative means of proving bias or motive or to challenge credibility.

*Thomas*, 336 A.3d at 1044 (cleaned up). This Court has held that "evidence of past sexual conduct by the victim with third persons is of little relevance to the issue of consent between the victim and a defendant when the victim and defendant did not have a prior sexual relationship." *Commonwealth v. Cramer*, 195 A.3d 594, 603 (Pa.Super. 2018).

Appellant explains that the victim initially referred to her encounter with Appellant and Mr. Toombs as a threesome, and "only alleged that she was sexually assaulted after being shamed by her sister for participating in a threesome." Appellant's brief at 72. He avers that the victim lied to the sexual assault examination nurse "regarding any consensual sexual activity prior to and after the alleged assault" where DNA from a third unknown male was found on her clothing. *Id*. Thus, this DNA evidence was relevant as to whether the victim also lied in claiming that the encounter among her, Appellant, and Mr. Toombs was nonconsensual. *Id*. at 73. According to Appellant, the victim "would have appeared less believable, and more like an attempt to avoid being labeled unchaste, had she also admitted to having sex with a third person so near in time with Appellant and [Mr.] Toombs that that third person's DNA was comingled with Appellant's." *Id*.

The court held a pre-trial hearing on this issue, and authored an order detailing its reasoning for denying Appellant the opportunity to present this DNA evidence, in pertinent part, as reproduced below:

> For purposes of impeachment, the evidence of an unknown DNA contributor, evidence that the injuries were caused by that contributor or, as a general category, evidence of the alleged victim's sexual conduct outside of the alleged assaults, are not here relevant and carry an immense and unfairly prejudicial effect, indeed the precise effect that [§] 3104 aims to preclude. Where the defense to an alleged assault is that the victim consented, which is the defense that [Appellant and Mr. Toombs] indicated they will mount at trial, impeachment evidence targeted at whether the alleged victim did or did not have sexual contact with anyone else is not relevant and will serve no basis other than to focus the jury's attention on the alleged victim's sexual history. [**See Cramer**, 195 A.3d at 604.] Whether the alleged victim spoke truthfully about how recently she had sexual contact with someone else has no relevance to the issue of whether she consented to sexual contact with [Appellant and Mr. Toombs]. Other means of challenging the alleged victim's credibility are self-evident from the arguments made at the hearing. Nothing prevents [the] defense from offering evidence or cross-examining the Commonwealth's expert witnesses about the fact that Mr. Toombs appears to be excluded from all tested DNA evidence, and [Appellant] from at least some of the DNA evidence, which would call into question the extent of their participation in the alleged assault and the alleged victim's recitation of the events.
>
> . . . .
>
> Overarchingly, the issue is that defense seeks to admit highly prejudicial evidence in exchange for very little probative value via impeaching the victim on a matter not before the jury and irrelevant to the issues at trial, and by presenting an alternate theory for the victim's injuries, which is purely conjectural and without consequence even if true.

Order of Court, 6/6/24, at 3-4 (cleaned up).

We discern no abuse of discretion. Although Appellant purports to claim that this evidence would have attacked the victim's credibility, DNA evidence from a third unknown male would not be relevant as to whether she lied about being assaulted by Appellant, given that his defense focused on whether the victim consented, not whether he was the individual involved in the sexual encounter. *See Cramer*, 195 A.3d at 604 (holding that DNA evidence from an unknown male to demonstrate that the victim lied to hospital staff about recent sexual activity was irrelevant where the appellant's defense at trial was that the victim consented, "not whether it was [the a]ppellant who sexually assaulted her or whether the sexual activity occurred"). This issue lacks merit.

In sum, Appellant has failed to demonstrate that the evidence was insufficient to uphold his convictions, that the court's denial of a new trial was the result of improper considerations, and that the trial court abused its discretion in precluding him from introducing DNA evidence of a third unknown male pursuant to the Rape Shield Law. Therefore, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 06/18/2026